UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

In re

SHARE BUILDING PRODUCTS, INC.,

Debtor.

Case No. 09-21553

Chapter 11

_____

MEMORANDUM DECISION ON DEBTOR'S OBJECTIONS TO CLAIMS OF
TIMOTHY RONDORF (#29) AND DAN JONES (#51)

_____

The debtor, Share Building Products, Inc., filed a chapter 11 petition on February 13, 2009. Two of the debtor's former employees filed proofs of claim for services performed prepetition without payment and the debtor objected to both claims. Evidentiary hearings were held on March 8, 2010, and April 12, 2010. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and the Court has jurisdiction under 28 U.S.C. § 1334. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

BACKGROUND

*Debtor's Objection to Claim of Timothy Rondorf.*

Timothy Rondorf filed a proof of claim in the amount of $22,851.80. At a hearing on February 2, 2010, the debtor agreed that Mr. Rondorf was entitled a general unsecured nonpriority claim in the amount of $5,251.80, plus a priority wage claim of $1,750.65. The debtor disputed that Mr. Rondorf was entitled to an additional $17,600 in wages earned more than 180 days before the filing of the petition.

It is undisputed that Mr. Rondorf, the debtor's former full-time plant manager and current shareholder, worked for eleven weeks from December 2007 through March 2008 without

receiving wages totaling $17,600. At the time, Mr. Rondorf had been told by Jim Weise, the debtor's chief financial officer, that the wages were not being paid to shareholders *at that time* due to a shortage in the debtor's cash flow. Mr. Rondorf assumed the debtor would pay those wages as soon as it was able to. Mr. Rondorf continued to work during that time because it was his understanding that he would eventually get paid. He was never told by the debtor to stop working or to apply for unemployment compensation. In April, after salary payments resumed, Mr. Rondorf met with Mr. Weise and Peter Share, the debtor's president, and was told by the latter that a plan would be formulated regarding the past due wages. No payment plan was ever made.

Peter Share testified that, due to cash flow problems, the debtor did not pay five of the six salaried employee-shareholders[1] from December 2007 through March 2008. According to Mr. Share, the debtor never promised the shareholders they would be paid for that time period and only suggested to the affected employees, "If we are still in business, we will re-examine it at that point." The debtor did not accrue the unpaid wages on its books. During the wage hiatus, the debtor continued to pay for health insurance premiums for all of its covered employees. The debtor never told the employee-shareholders not to seek unemployment compensation.

*Debtor's Objection to Claim of Dan Jones*.

Dan Jones filed a proof of claim in the amount of $199,800.00 for wages and expenses accrued during his employment with the debtor. Mr. Jones testified that at various times since

---

[1] Jeanie Wunder, a shareholder-employee who "ran the day-to-day operations of the company" as an office manager, did receive compensation during that time because, according to Mr. Share, the debtor "needed her." Ms. Wunder and her husband loaned the debtor $50,000.00 in 2006, and filed a claim in this case in the amount of $58,221.11. This claim is not disputed.

2003, he served as the debtor's employee, senior vice president of sales and marketing, corporate vice president, and shareholder. The debtor paid Mr. Jones $115,000 in 2004, $147,000 in 2005, $165,000 in 2006, $187,000 in 2007, and $63,000 in 2008. Like Mr. Rondorf, Mr. Jones worked for eleven weeks from December 2007 through March 2008 without receiving any wages. He also performed services for the debtor in 2008 and early 2009 without receiving full compensation. At an October 28, 2008, meeting between Mr. Jones and Mr. Share, the latter provided the former with notes regarding Mr. Jones's unpaid commissions between December 2007 and March 2008, totaling $15,909.99. (Group Exhibit No. 1, p. 4 of all filed exhibits). This is in addition to his claim for wages.

Mr. Jones stated he continued to pursue sales for the debtor for no pay or at a reduced rate, based upon Mr. Share's verbal promises that the debtor would purchase back its stock from Mr. Jones, as well as pay him all wages and commissions previously earned and still owed. While the parties discussed making Mr. Jones an independent sales representative for the debtor, no formal agreement was ever entered into. An email from Peter Share, dated January 28, 2009, stated Mr. Jones left his at-will employee position, effective November 8, 2008, and was terminated from his non-compensated position as company vice president. (*See* Exhibit 8).

Despite the fact that his last paycheck from the debtor was received on November 13, 2008 (*see* Exhibit 6), Mr. Jones continued to worked on the Carter Lumber account in late 2008 and early 2009. He was paid only $65,020.91 from December 28, 2007, through February 20, 2009. Based upon his previously paid salary ($7,923.08 bi-weekly gross), Mr Jones asserts he should have been paid an additional $180,594.57 in prepetition wages. (Attachment to Proof of

3

Claim No. 51).² Of this amount, at least $10,950 was earned within 180 days of the date of the petition and would be entitled to priority status under section 507(a)(4) of the Bankruptcy Code.

On June 12, 2007, the company announced that various shareholders had purchased stock, including Mr. Jones, who purchased 20 shares of the debtor's stock for $3,500 per share for a four year payment term. (*See* Exhibit 3). Because the stock was not purchased with cash, payment for the stock was to be made through payroll deductions. The debtor's records of the stock purchase and payment plan shows Mr. Jones purchased 19 shares at $3,000 each under the payroll deduction plan, for a total of $57,000. Mr. Jones was credited with making payments on that loan, via payroll deductions, totaling $6,351.19. (*See* Exhibit 4).³ According to Mr. Jones, in October 2008 Mr. Share agreed to purchase back Mr. Jones's shares of company stock, as part of its unwritten plan to compensate him for past and future earnings. At the hearing, Mr. Share did not recall having made such a promise.

Mr. Jones requested Mr. Share formulate a written plan for compensation via several email exchanges between December 2008 and February 2009. (*See* Group Exhibit No. 1). Aside from one exception, the email responses from Mr. Share were silent regarding the unpaid earnings. In an email sent February 3, 2009, from Peter Share to Dan Jones and Jim Weise, Mr. Share acknowledged the following:

---

²According to the court's calculations, the number would be slightly higher, but we will accept Mr. Jones' calculations.

³According to the debtor's account receivable records, Mr. Jones owes it $57,009.51 for the purchase of stock and entries titled "A/R Customers." (Exhibit 4). Testimony elicited at the hearing explained that a portion of the amount owed, $50,648.81, was for the balance still due on Mr. Jones's stock purchase. No explanation was given, however, as to the $6,360.70 balance owed the debtor relating to "A/R Customers," so the Court finds that Mr. Jones owes the debtor $50,648.81 for the purchase of his 19 shares.

4

> ... There are other bills that we need to address- get out on the table- and then get a plan. Besides expenses, you [Dan Jones], Jim [Weise] and I [Peter Share] had some accrued wages from second quarter, I believe. We both need to get these items, including the stock, the rep agreement, Big River finalized. ...

(Group Exhibit No. 1, p. 35 of all filed exhibits).

On February 11, 2009, Mr. Share left two voice mail messages on Mr. Jones's cell phone, in which he stated the following:

> We don't have a formal agreement, yet. But we are planning on having an agreement with you. But on good faith. We're gonna hon...we're gonna pay you what we talked about, and ah give me a call. ...
>
> The other thing is Share has zero cash in its checkbook. Our sales last year were under 6.3 million and the bank has got us in a agreement, er a position where, a disbursement log, where we can't release stuff. So even though there's ah some expense money and ah etc. owed to you, there's no money in the checkbook. So, I'm not getting paid, the top people, Karcher, Kelly – Kelly's independent rep, officially – as well. So there's no money going out, so there's no money to give you a check. So anyway, anyway. Good luck today. Give me a call.

(*See* Group Exhibit No. 1, p. 2 of all filed exhibits). According to Mr. Share, he was referring to a proposed independent sales representative agreement between the debtor and Mr. Jones, not any past-due earnings.

Mr. Share testified that he never promised Mr. Jones he would be paid additional wages and the debtor did not accrue the wages on its books. Also, according to Mr. Share, he never promised to buy the debtor's stock back from Mr. Jones. Mr. Share stated the debtor paid Mr. Jones four weeks' worth of severance pay in 2008 after he became an independent representative, continued to provide Mr. Jones with health insurance through the end of 2008, and allowed him to use a company vehicle into early 2009.

According to Mr. Share, Carter Lumber made consignment orders in 2009 totaling

5

approximately $28,000. If there had been a rep agreement with Mr. Jones, it would have been a 6% commission ($1,680). Mr. Share also stated that, other than the salary hiatus in December 2007 through March 2008, Mr. Jones was not shorted on any payroll checks.

Mr. Jones attended trade shows in 2008 and early 2009 and provided literature and supplies, all at his own expense. According to Mr. Jones, as of December 27, 2008, his unpaid expenses totaled $11,689.80. (Attachment to Proof of Claim No. 51). This attachment is only part of the debtor's expense ledger and the second page presented at trial shows that the total expenses owed Mr. Jones is $13,212.61. (Group Exhibit 1, pp. 76-77). According to the debtor's exhibit, Mr. Jones' unpaid expenses totaled $7,004.87. (*See* Exhibit 5). Exhibit 5 appears to be an incomplete summary covering only part of the year.

## DISCUSSION

Under 11 U.S.C. § 502(a), a creditor's proof of claim is deemed allowed unless a party in interest objects. When there is an objection by an interested party, the court shall, after notice and a hearing, determine the proper amount of the claim as of the date of the petition, and shall allow such claim unless such claim fits into one of the categories forbidden by 11 U.S.C. § 502(b). Under 11 U.S.C. § 502(b)(1), the claim should not be allowed if it would not be enforceable under applicable law. Under Bankruptcy Rule 3001(f), a proof of claim filed in appropriate form with appropriate documentation shall constitute prima facie evidence of its validity. An objection to claim must then provide some evidence to defeat the presumption of validity. *In re Airadigm Commc'ns, Inc.*, 376 B.R. 903, 916 (Bankr. W.D. Wis. 2007).

*Doctrine of Quantum Meruit as Applied to Wage Hiatus Period of Rondorf and Jones Claims*.

There was no express contract between the debtor and the claimants to continue to work

for no pay. Where a party provides services to another party under an otherwise unenforceable contract, the party may nevertheless recover the value of the services upon quantum meruit. *Mead v. Ringling*, 266 Wis. 523, 528, 64 N.W.2d 222 (1954). The doctrine of quantum meruit is also known as implied-in-fact contract in Wisconsin. *See W.H. Fuller Co. v. Seater*, 226 Wis.2d 381, 386 n. 2, 595 N.W.2d 96 (Ct. App. 1999). A claim for recovery in quantum meruit requires application of an equitable doctrine. *Baierl v. McTaggart*, 2001 WI 107, ¶ 42 n. 1, 245 Wis.2d 632, 629 N.W.2d 277 (Crooks, J., concurring) (citing Black's Law Dictionary 1255 (7th ed. 1999)). The decision to grant equitable relief is a discretionary decision of the trial court. *Zinda v. Krause*, 191 Wis.2d 154, 175, 528 N.W.2d 55 (Ct. App. 1995).

Quantum meruit is a quasi-contract theory that compensates a plaintiff where a defendant receives services from the plaintiff without providing compensation for those services when it would be unfair not to do so. "'The general rule is that if a person performs valuable services for another at that other's request, the law implies, as matter of fact, the making of a promise by the latter and acceptance thereof by the former to pay the one performing the service the reasonable value thereof.'" *Theuerkauf v. Sutton*, 102 Wis.2d 176, 184, 306 N.W.2d 651 (1981) (quoting *Wojahn v. National Union Bank*, 144 Wis. 646, 667, 129 N.W. 1068 (1911)). Under Wisconsin law, quantum meruit requires that "(1) the defendant requested the plaintiff to perform services, (2) the plaintiff complied with the request, and (3) the services were valuable to the defendant." *Theuerkauf*, 102 Wis.2d at 185, 306 N.W.2d at 658; *W.H. Fuller Co.*, 226 Wis.2d at 386 n. 2, 595 N.W.2d at 99. In essence, the law implies a contract by the parties' conduct where one is not explicit. As explained by the supreme court:

> The ultimate and dispositive inquiry is that an implied in fact contract is not conclusively

7

> proved unless it is shown that the parties, by their words, their conduct, or course of dealing, came to a mutual agreement and this determination in turn depends upon an objective assessment of the parties' external expressions of intention as distinguished from their undisclosed intentions.

*Theuerkauf*, 102 Wis. 2d at 186, 306 N.W.2d at 658 (citation omitted).

Without question, quantum meruit applies to both these claimants. Both former employees were credible in their assertions that they were encouraged to believe that they would be paid for the eleven week interruption in salary when cash flow for the company got better. Mr. Share's claims to the contrary were not persuasive. Even if he did not demand that they continue to work, he admitted he told them the matter would be re-examined at a later date, provided the company was still in business. The employees reasonably construed this as an admission that the salary was owed, and the fact that he kept it off the books implies only that he was probably attempting to maintain the debtor's borrowing base. These employees were strung along and allowed to assume they would be paid. When salary payments resumed and they wanted to know when the missed payments would be made, Mr. Share repeatedly dodged the issue with silence and vague promises, but without ever denying that salary was owed. Mr. Jones, especially, was encouraged with "we're gonna pay you what we talked about" in conjunction with a reference to skipped salary, and he was asked to keep working in "good faith." In fact, on February 3, 2009, Mr. Share acknowledged in an email that Mr. Jones, among others, had wages coming. If Mr. Share honestly never intended to pay either of these employees for the hiatus period, he would have spoken up during at least one of the several opportunities he had to disabuse them of their assumptions. They provided a benefit to the debtor with the debtor's implied request and consent, and it is not fair to deny their right to be paid.

Mr. Jones was also encouraged to continue working on the Carter Lumber account after his last paycheck dated November 13, 2008. Mr. Share's contention that Mr. Jones was not an employee after November 8, 2008, which he did not memorialize until the January 28, 2009, email, makes no sense. He acknowledged that the independent representative agreement was never signed, but the debtor's records show that Mr. Jones continued to work and incur expenses on the company's behalf. Mr. Share also claimed Mr. Jones received severance pay, but this is not confirmed by the debtor' payroll records. The January 28, 2009, email also stated that effective immediately, Mr. Jones was terminated as the "Corporate non-compensated Vice President" of the debtor. Having continued to work in that capacity, and having previously been compensated for that role, it is not fair to retroactively declare Mr. Jones "non-compensated" over two months after services were rendered.

If quantum meruit applies, "The measure of damages for one seeking the reasonable value of services in quantum meruit is defined in terms of the 'rate of pay for such work in the community at the time the work was performed.'" *Barnes v. Lozoff*, 20 Wis.2d 644, 652, 123 N.W.2d 543 (1963) (citing *Mead*, 266 Wis. at 529); *see also Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 483 (7th Cir. 2009).

Mr. Rondorf is entitled to $17,600 in wages earned during the wage hiatus period ($1,600 per week for 11 weeks). Mr. Jones is entitled to $15,909.99 in unpaid commissions (per Group Exhibit 1, pp. 4-5), as well as unpaid salary for the hiatus period and for much of 2008 and the beginning of 2009 in the amount of $180,594.57 (Group Exhibit 1, p. 37). Mr. Jones is also entitled to reimbursement of expenses in the amount of $13,212.61 (Group Exhibit 1, pp. 76-77) for a total claim of $209,717.17. Of that total amount, $10,950 was earned within 180 days of

9

filing and is a priority claim under section 507(a)(4).

Mr. Jones acknowledged that he still owes $50,648.81 as the remainder of his debt for purchase of the debtor's stock. There was insufficient evidence to prove that the company agreed to buy it back. Therefore, this must reduce the amount owed him by the debtor, leaving him with a priority wage claim of $10,950, and a general unsecured nonpriority claim of $148,118.36.

## CONCLUSION

Based on the foregoing, the Court finds that, as previously agreed to by the debtor, Mr. Rondorf is entitled to a general unsecured nonpriority claim in the amount of $5,251.80, as well as a priority wage claim in the amount of $1,750.65. The Court also finds that Mr. Rondorf is entitled to $17,600 in wages earned more than 180 days before for the filing of the petition, as a general unsecured nonpriority claim, under the doctrine of quantum meruit, for a total nonpriority claim of $22,851.80.

As to the claim of Mr. Jones, the Court finds he is entitled to a priority wage claim of $10,950, plus a general unsecured nonpriority claim of $148,118.36.

A separate order will be entered accordingly.

June 10, 2010

Margaret Dee McGarity
United States Bankruptcy Judge

10

Case 09-21553-mdm    Doc 253    Filed 06/10/10    Page 10 of 10